

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a corporation, | ) ) ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 7:14-cv-2286-JEO |
| | ) | |
| BRYAN MARTIN, an individual, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff/ Third-Party Plaintiff, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD HUBBARD, et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## REPORT AND RECOMMENDATION

In this diversity action, Travelers Casualty and Surety Company of America ("Travelers")
asserts that Bryan Martin ("Mr. Martin") is liable to indemnify Travelers expenses it incurred as
a surety on a redemption bond.  (Doc.[1] 1).  Mr. Martin and his wife, Shadi Martin ("Mrs.
Martin") (collectively the "Martins"), have filed pleadings denying liability and asserting claims
against Travelers and a host of other parties involved in the closing transaction at which the

---

[1]References to "Doc(s). ___" are to the document numbers of the pleadings, motions, and
other materials in the court file, as compiled and designated on the docket sheet by the Clerk of
the Court.  Pinpoint citations to pleadings are to the paragraph number where possible.
Otherwise, all pinpoint citations are to the page of the electronically filed document in the court's
CM/ECF system, which may not correspond to the pagination on the original "hard copy"
presented for filing.

Martins purchased the subject property, including the obligee on the redemption bond, First American Title Insurance Company ("First American").  (Docs. 7, 33).  The action has been assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and this court's general order of reference dated January 14, 2013.  The cause now comes to be heard for a report and recommendation, *see* 28 U.S.C. § 636(b), FED. R. CIV. P.  72(b)(1), on four pending motions:

(1)     a motion to strike or, in the alternative, to dismiss, filed by First American, asserting that the Martins' claims against it, designated in their Amended Counterclaim and Third-Party Complaint as "third-party claims," are not authorized under FED. R. CIV. P. 14 (Doc. 46);

(2)     a corresponding motion filed by the Martins formally seeking leave under FED. R. CIV. P. 15(a) to file their previously-filed Amended Counterclaim and Third-Party Complaint (Doc. 52);

(3)     a motion by Travelers under FED. R. CIV. P. 56 for partial summary judgment on its claim for indemnity against Mr. Martin (Doc. 54); and

(4)     an associated motion by the Martins asking the court to defer ruling on Travelers' motion for summary judgment under FED. R. CIV. P. 56(d) (Doc. 57 at 13-19).

Upon consideration, it will be recommended as follows:  (1) that the court clarify, *sua sponte*, that Mrs. Martin is, in fact, a party and direct the Clerk to add her to the docket sheet as a "counterclaim plaintiff"; (2) that First American's motion to strike or dismiss be denied; (3) that the Martins' Rule 15(a) motion for leave to file their Amended Counterclaim and Third-Party Complaint be granted; (4) that the Martins' motion under Rule 56(d) to defer summary judgment and allow discovery be denied and (5) that Travelers' motion for partial summary judgment on its claim against Mr. Martin be granted.

I.      BACKGROUND

The salient facts for purposes of the parties' pending motions are these[2]:  The subject property involved in this civil action is a residence located in Tuscaloosa, Alabama (hereinafter the "Property").  It was formerly owned by a one Lenora Jones, who died on or about August 4, 2013.  Due to her passing, her loan on the Property, then owned by JP Morgan Chase Bank, went unpaid.  That bank foreclosed its mortgage and sold the Property at public auction on August 20, 2013, to E & R, L.L.C. ("E & R") for $37,728.07.  In turn, E & R listed the Property for sale.  On September 6, 2013, E & R entered into a contract to sell the Property to the Martins for $127,000.  However, under Alabama law, when real property is sold in foreclosure, as here, a defaulting mortgagor like Lenora Jones or her heirs has a statutory right to redeem the property for a period of one year from the date of the foreclosure sale.  *See* Ala. Code §§ 6-5-248, 6-5-249 (1975)[3]; *Bockman v. WCH, LLC*, 943 So. 2d 789, 792 (Ala. 2006); *In re Poe*, 477 F.3d 1317, 1319 (11th Cir. 2007).  To exercise such right, the redeeming party must pay to the current owner of the property an amount representing the price paid at the foreclosure sale, interest, and certain other charges, including the cost of any permanent improvements.  *See* Ala. Code § 6-5-253. The Martins' contract with E & R advised them that the Property they were to purchase was subject to statutory rights of redemption.  (Doc. 33, ¶ 13).

On September 30, 2013, the closing was held at the Tuscaloosa offices of First Capital

---

[2]The factual summary set forth herein is gleaned from the undersigned's review of the pleadings and evidence in the court file.  The undersigned has endeavored to acknowledge discrepancies in the factual allegations made by the parties where they are material to the resolution of the pending motions.  However, this summary presents the "facts" only for purposes of such resolution; they may not be the actual facts.

[3]All citations herein to the Alabama Code are to the 1975 codification.

Title, Inc. ("First Capital"), and its employee, Nikki Plowman, was the closing agent. (Doc. 33, ¶¶ 8, 19, 20).  The Martins financed their purchase of the Property through the Bank of Tuscaloosa (hereinafter the "Bank"), which agreed to loan them $128,000 in exchange for a mortgage.  (*Id.,* ¶ 17).  As part of their agreement with the Bank, the Martins had to obtain a title insurance policy covering the Bank.  (*Id.*)  To that end, on September 25, 2013, First American, through its authorized agent First Capital, issued a title insurance commitment.  (*Id.*, ¶ 16).  However, First American was unwilling to issue a title policy unless it received a redemption bond to cover any claim made by the Bank should the Property be redeemed following the sale.  (Doc. 33, ¶ 17).  In relation to that demand, included in the amount the Martins paid in escrow was $1,285.00, representing the premium on a redemption bond issued by Travelers, through its agent, Pritchett-Moore, Inc. ("Pritchett-Moore").  (*See id.*, ¶¶ 8, 19).  And at the closing, Mr. Martin was presented with that redemption bond, which provides as follows:

**Travelers Casualty and Surety Company of America**

**<u>Right of Redemption Bond,</u>**

Bond No. <u>105981013</u>

Know all men by these presents, that <u>Bryant (sic) Martin</u>, as principal, and <u>Travelers Casualty and Surety Company of America</u>, a corporation under the laws of the state of Connecticut, as surety, are held and firmly bound unto <u>First American Title Insurance Company</u>, in the penal sum of <u>One Hundred Twenty Eight Thousand Five Hundred and no/100 dollars ($128,500.00)</u>, lawful money of the United States of America, to the payment of which well and truly to be made, we hereby bind ourselves and our heirs, successors and assigns, jointly and severally firmly by these presents,

Whereas, <u>Bryant (sic) Martin</u> is the purchaser of the following described real estate to wit:

<u>See Attached Legal Description</u>

Whereas the said <u>Bryant (sic) Martin</u> now desires to mortgage said real

estate and has applied to <u>Bryant (sic) Martin</u> for a title insurance policy, and

Whereas, <u>First American Title Insurance Company</u>, is unwilling to insure the title of said real estate without being properly indemnified against any loss or for any claims arising from persons entitled to redeem real estate under the statutes of Alabama, which rights will exist during the statutory period <u>September 30, 2013 - August 20, 2014</u>.

Now, therefore, if the principal shall indemnify and hold harmless said <u>First American Title Insurance Company</u> for an on account of any claims above described, then this obligation shall be void, otherwise to remain in full force and effect.

In no event, however, shall the surety's obligation under this bond exceed the maximum aggregate sum of <u>$128,500.00</u>.

In witness, whereof the principal and surety have hereunto set their hands and seals this <u>30th</u> day of <u>September, 2013</u>.

(Doc. 1-2 ("Redemption Bond") (underlining original)).  Mr. Martin affixed his signature to the

Redemption Bond on the line marked "Principal."  (*Id.*; Doc. 7, ¶ 11; Doc. 33, ¶ 17).  It was also

signed by Pritchett-Moore's agent, Tom Bonhaus, via a power of attorney authorizing him to sign

for Travelers as "Surety."  (*See* Doc. 33, ¶ 20; Doc. 1-2; Doc. 1-3 at 1).

Travelers alleges that, at the closing, in addition to the Redemption Bond itself, Mr.

Martin also signed another, two-page Travelers form document captioned, "Commercial Surety

Bond Application (Form A)," containing an "Indemnity Agreement."  (*See* Doc. 1, ¶¶ 12, 13;

Doc. 1-3 ("Indemnity Agreement")).  In spaces at the top of the form are hand-written entries

indicating that the application is for a "Right of Redemption" bond in the amount of $128,500,

effective "9/30/13," and identifying Pritchett-Moore as the "Agency," Bonhaus as the "Agent,"

Mr. Martin as the "Applicant," and First American as the "Obligee."  (Doc. 1-3 at 1).  Below

those spaces is the header "Indemnity Agreement," followed by the operative language of the

document, which includes the following:

> Indemnitors will at all times indemnify and exonerate [Travelers] from and
> against any and all loss, cost and expense of whatever kind which it may incur or
> sustain as a result of in connection with the furnishing of the Bond and/or the
> enforcement of this Agreement, including unpaid premiums, interest, court costs
> and counsel fees, and any expense incurred or sustained by reason of making any
> investigation.  To this end, Indemnitors promise: a) to promptly reimburse
> [Travelers] for all sums paid and b) to deposit with [Travelers] on demand an
> amount to sufficient to discharge any claim made against [Travelers] on the Bond.
> This sum may be used by [Travelers] to pay such claim or be held by [Travelers]
> as collateral security against loss or cost on the Bond.

(Doc. 1-3).  On the second page of this Indemnity Agreement is what purports to be the signature

of Mr. Martin as "Indemnitor," dated "9/30/13," along with Mr. Martin's hand-printed name.

(*Id.* at 2).  The document is also signed by Plowman as a witness.  (*Id.*)

According to the Martins' pleadings, on October 8, 2013, just eight days after the closing,

Woodford Dinning, Jr., an attorney for Alexander Jones (hereinafter "Jones"), the representative

or heir of the estate of Lenora Jones, wrote a letter to Plowman giving "formal notice" that Jones

was going to redeem the Property.  (Doc. 7, ¶ 21; Doc. 33, ¶ 25).  The next day, Plowman

forwarded Dinning's letter to a representative of the Bank, who then contacted Mr. Martin,

informing him, for the first time, of any plan to redeem.  (Doc. 7, ¶¶ 24-26; Doc. 33, ¶¶ 28-30).

On or about March 28, 2014, Jones redeemed the Property by tendering the sum of $49,378.01 to

the Martins, who then forwarded it to the Bank to reduce their mortgage indebtedness.  (Doc. 33,

¶ 32).  The Martins were then required to give a quitclaim deed on the Property to Jones.  (*Id.*)

Upon being notified of the redemption, the Bank made a claim under the title policy with

First American, which, in turn, made a claim under the Redemption Bond with Travelers.  On

April 25, 2014, Travelers paid $77,044.14 to First American, representing the sum that First

American had paid to the Bank, and First American released Travelers from further obligation

under the Redemption Bond.  (Doc. 1-4).  Travelers thereafter demanded that Mr. Martin

reimburse it for the amount Travelers paid to First American.  (Doc. 1-5).  Mr. Martin refused.

Travelers filed this action on November 25, 2014, naming Mr. Martin as the sole

defendant.  (Doc. 1).  In its one-count Complaint, Travelers claimed that,

> pursuant to the Indemnity Agreement, as well as at common law, [Mr. Martin] is
> liable to indemnify Travelers and hold it harmless from all losses and/or expenses
> (including, but not limited to, interest, court costs and counsel fees) and from and
> against any and all such losses and/or expenses that Travelers has sustained or
> incurred by reason of having executed the Right of Redemption Bond.

(Doc. 1, ¶ 20).  Travelers founded federal subject-matter jurisdiction on diversity, pleading

allegations indicating that it is a citizen of Connecticut, that Mr. Martin is a citizen of Alabama,

and that the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.

On January 26, 2015, Mr. Martin filed a consolidated responsive pleading that included

both an Answer and a "Counterclaim and Third Party Complaint."  (Doc. 7[4]).  In his Answer, Mr.

Martin denied liability and raised a variety of affirmative defenses.  (*Id.*, Answ. ¶¶ 1-22,

Affirmative Defenses 1-17).  In his Counterclaim and Third-Party Complaint, he raised claims

for relief in four counts against Travelers and six new parties: (1) E & R; its two "members and

managers," (2) Edward Hubbard and (3) Richard Henry (*id.*, Counterclaim ¶¶ 5, 6, 11); (4) First

Capital; (5) Plowman; and (6) Pritchett-Moore.  Broadly speaking, Mr. Martin seeds to avoid

liability and/or recover damages based on allegations that Travelers and the newly-named parties

were guilty of fraudulent suppression, forgery, conspiracy, and breach of the covenant of good

faith and fair dealing.  In particular, Mr. Martin insists that, contrary to Travelers' assertions, he

---

[4]Mr. Martin's original responsive pleading, Document 7, contains both an "Answer" and
a "Counterclaim and Third Party Complaint," each of which have their own separately
enumerated paragraphs beginning with "1."  As such, citations to Document 7 will further
identify whether they reference the "Answer" ("Answ.") and the paragraphs and/or affirmative
defenses therein, or the "Counterclaim and Third Party Complaint" ("Counterclaim") and the
paragraphs therein.

was not presented with the Indemnity Agreement at the closing, that he never laid eyes on the document until Travelers sent him a copy in April 2014, and that his purported signature thereupon is a forgery. (*Id.*, Answ. ¶¶ 18, 19, Fourth Affirmative Defense; *id.*, Counterclaim, ¶ 41). Nor, Mr. Martin said, was he otherwise told at or prior to the closing that he would be obligated to indemnify Travelers if it were to pay a claim on the Redemption Bond. (Doc. 7, Counterclaim ¶ 19). Mr. Martin further alleges, on information and belief, that the attorney for the estate of Lenora Jones, Dinning, had contacted Plowman and E & R as much as five days before the closing to advise that the representative of the estate intended to redeem the property, yet this fact was not disclosed to Mr. Martin, even as he was being sold the Property and the Redemption Bond. (*Id.*, ¶ 22).

On April 7, 2015, the court entered a scheduling order pursuant to FED. R. CIV. P. 16(b). (Doc. 27). That order set a variety of deadlines, including that Travelers might have until July 14, 2015, to add new causes of action, defenses, or parties, while Mr. Martin might have until August 14, 2015, to do likewise. (*Id.*, ¶ 4). Shortly thereafter, new counsel appeared in the case for Mr. Martin, and his original counsel was permitted to withdraw. (Docs. 28, 29, 30, 31).

On June 1, 2015, Mr. Martin, without first moving for leave of court, filed an "Amended Counterclaim and Third Party Complaint." (Doc. 33). That pleading names First American as an additional adverse party and also appears to seek damages on behalf of not only Mr. Martin but also Mrs. Martin as well. (*See id.* at 1, Caption; *id.*, ¶¶ 2, 42). In support, the pleading raises claims in five counts against Travelers, E & R, Hubbard, Henry, First Capital, Plowman, Pritchett-Moore, and First American (hereinafter collectively the "Adverse Parties"[5]).

---

[5]The undersigned refers to these parties collectively by the generic identifier "Adverse Parties" because it is currently disputed whether all or some of them may be properly

In Count One, the Martins raise claims for fraudulent suppression against all of the Adverse Parties, alleging a failure to disclose a variety of facts at or prior to the closing on September 30, 2013.  (*Id.*, Count One, ¶¶ 36-42).  First, the Martins maintain that they were due to be told of the "relationships" between E & R, Henry, Hubbard, First Capital, and Pritchett-Moore.  (*Id.*, ¶ 39).  On that score, the Martins allege that Hubbard and Henry are the "member/managers" of E & R (*id.,* ¶ 4); that E & R was "organized" by the president of First Capital, Robert S. Plott (*id.*); that Henry, who was the listing agent for the Property, was also the Director of Business Development at First Capital (*id.,* ¶¶ 4, 13, 14); and that Hubbard was also a licensed real estate agent at Pritchett-Moore, the agency that sold the Redemption Bond to Mr. Martin on behalf of Travelers.  (*Id.*, ¶ 6).  Second, the Martins claim that the Adverse Parties breached a duty to disclose that Jones had expressed an intention to redeem the Property, based on an allegation that his attorney, Woodford Dinning, Jr., or a representative in his office had told as much to Plowman on September 25, 2013, five days before the closing.  (*See id.,* ¶¶ 12, 15, 29, 39).  And third, the Martins contend that, while the language of the Indemnity Agreement provides that Mr. Martin would be required to reimburse Travelers if it had to pay a claim under the Redemption Bond, the Adverse Parties breached a duty to disclose that, pursuant to their "own policies" and "standard industry practices" (*id.,* ¶ 23), "it should have been E & R," as the party that first bought the Property out of foreclosure and then sold it to the Martins, that would bear the responsibility of reimbursing Travelers following a redemption.  (*Id.,* ¶ 21; *see also id.,* ¶ 33 ("[The Adverse Parties] know that the Buyer of a foreclosed property during the one year redemption period does not sign a Redemption Bond, nor does a Buyer indemnify the Issuer of a

characterized under the Federal Rules of Civil Procedure as either "Counterclaim Defendants" or "Third-Party Defendants."

Redemption Bond; they all know that the Seller in such a transaction is the indemnifying party."); *id.* ¶ 40 ("[The Adverse Parties] failed to disclose that ... E & R ... would have been the proper party to the indemnity agreement as E & R received the proceeds from the sale.")).  The Martins claim that, absent the suppression of these facts, they would not gone forward with the closing or purchased the Redemption Bond.  (*Id.* ¶ 41).

In Count Two, the Martins contend that all Adverse Parties are liable for having "breached the implied covenant of good faith and fair dealing in their respective contracts with Mr. Martin by failing to inform him that the personal representative of the former owner of the Property had contacted Plowman and E & R concerning redemption of the Property."  (*Id.*, ¶ 44).  In support, the Martins rely on the alleged communication between Plowman and Dinning's office on September 25th.  (*See id.,* ¶¶ 15, 25, 44).  The Martins also assert that, on that same date, Plowman, acting as an agent of E & R, informed Dinning that the redemption amount was the price that E & R had paid for the Property at the foreclosure sale, $37,728.07.  (*Id.*, ¶ 15).

In Count Three, the Martins claim that Travelers, E & R, First Capital, Plowman, Pritchett-Moore, and First American are liable for fraud.  (*Id.*, Count Three, ¶¶ 46-49).  These claims are founded upon an allegation that Mr. Martin's purported signature on the Indemnity Agreement is a forgery.  In support, the Martins contend, upon information and belief, that such was done by Plowman, acting as an agent of the Adverse Parties named above.  (*Id.*)  Count Four, in turn, claims generally that all Adverse Parties engaged in a fraudulent conspiracy. (*Id.*, Count Four, ¶¶ 50-52; *see also id.,* ¶ 35).

Finally, Count Five is captioned "Negligence/Willfulness and Wantonness."  (*Id.*, Count Five, ¶¶ 53-55).  It alleges that all Adverse Parties are liable based on allegations that they failed to exercise reasonable care and otherwise breached tort duties "by failing to follow their own

policies and/or standard industry practice." (*Id.*, ¶ 54). The Adverse Parties did so, the Martins allege, in order "to protect the profits for each of them to the detriment of the [Martins]." (*Id.*; *see also id.,* ¶ 23 ("The reason that the [Adverse Parties] acted in this fashion is because they knew full well that the [P]roperty was going to be redeemed and they all wanted their respective profits from the closing. They committed these fraudulent, negligent and willful and wanton actions with the specific design to injure the [Martins]."); *id.,* ¶ 33 (outlining what each of the Adverse Parties allegedly gained from the closing and the sale of the Redemption Bond)). These claims appear to be founded upon the Martins' contention that, under standard industry practice, E & R, rather than the Martins, "should have been" the "proper party" to reimburse Travelers if it paid a claim under the Redemption Bond. (*Id.,* ¶¶ 21, 33, 40).

In response to the Martins' Amended Counterclaim and Third-Party Complaint, Travelers filed an Amended Complaint of its own against Mr. Martin. (Doc. 37). That pleading is in all material respects identical to its predecessor except that it adds a second count in which Travelers claims that Mr. Martin is also liable for reimbursement pursuant to Ala. Code § 8-3-5. (*Id.*, Count Two, ¶¶ 23-24). That statute provides: "Payment by a surety or endorser of a debt past due entitles him to proceed immediately against his principal for the sum paid, with interest thereon, and all legal costs to which he may have been subjected by the default of the principal." Ala. Code § 8-3-5.

On August 13, 2015, First American moved to strike or, in the alternative, to dismiss the claims raised against it by the Martins' Amended Counterclaim and Third-Party Complaint. (Doc. 46). In particular, First American argues that such claims cannot be asserted as "third-party claims" under FED. R. CIV. P. 14. (*Id.* at 2). Instead, First American contends, they must be asserted, if at all, in a separate action. (*Id.*) In addition, First American maintains that the

11

Martins' claims against it are also "procedurally improper" because the Martins did not seek leave of court under FED. R. CIV. P. 15(a)(2) before filing their Amended Counterclaim and Third-Party Complaint.  (*Id.* at 6).

On August 28, 2015, the Martins filed an opposition to First American's motion to strike or dismiss, arguing that, even assuming that the claims against First American are not technically authorized as third-party claims under FED. R. CIV. P. 14, they are nonetheless authorized counterclaims under FED. R. CIV. P. 13.  (Doc. 51).  The Martins also contemporaneously filed a motion retroactively seeking leave to file its previously submitted Amended Counterclaim and Third-Party Complaint.  (Doc. 52).  First American thereafter filed a consolidated response containing both a reply in support of its motion to strike or dismiss and an opposition to the Martins' motion for leave.  (Doc. 53).

On April 13, 2016, Travelers moved for partial summary judgment, asserting that it is entitled to prevail on its claim against Mr. Martin for reimbursement under the Redemption Bond.  (Doc. 54).  Specifically, Travelers seeks judgment against Mr. Martin in the amount of $91,578.14, representing the $77,440.14 that Travelers paid to First American under the Redemption Bond plus an additional $14,534.00 for attorney's fees, costs, and expenses incurred in the investigation, resolution, and enforcement of its current claim.  Travelers' motion is accompanied by a supporting brief (Doc. 55) and an evidentiary submission.  (Doc. 56).

Mr. Martin has opposed Travelers' motion for summary judgment.  (Doc. 57).  He maintains that Travelers' motion is due to be denied on the merits.  (*Id.* at 9-13).  Alternatively, Mr. Martin asks the court, pursuant to FED. R. CIV. P. 56(d), to defer consideration on Travelers' motion until after the Martins have had an opportunity to conduct depositions and other discovery.  (*Id.* at 13-19).  In support, the Martins have filed an evidentiary submission that

12

includes affidavits from Mr. Martin and the Martins counsel.  (Docs. 57-1, 57-2).  Travelers has

filed a reply, urging that its motion for summary judgment on its claim against Mr. Martin is both

meritorious and ripe without the need for any additional discovery.  (Doc. 58).

## II.    DISCUSSION

### A.    Mrs. Martin's Status as a Party

Before examining the pending motions, it is appropriate to clarify, *sua sponte*, an

uncertain matter concerning identification of the parties.  In particular, the undersigned discerns

there to be issues with regard to whether Mrs. Martin is, in fact, a party and, if so, whether she

has been properly added.   She is not listed as a party on the docket sheet.   Nonetheless,

respective counsel for at least the Martins and First American appear to assume that she is a

party.  That appears to stem, however, from their shared misconception that Travelers has named

both Mr. Martin and Mrs. Martin as defendants in connection with Travelers' original claim for

indemnity on the Redemption Bond. (*See* Doc. 33 ¶ 22; Doc. 46 at 1).  In fact, Travelers has sued

only Mr. Martin.  (*See* Docs. 1, 37).  Despite that, it seems that defense counsel has endeavored

to assert claims against Travelers and the other Adverse Parties on behalf of not only Mr. Martin

but also Mrs. Martin, through the filing of the Amended Counterclaim and Third-Party

Complaint.  (*See* Doc. 33).  That pleading is not a model of clarity on the point, as it states that it

is filed on behalf of "the Defendant/Counter Plaintiff Bryan Martin" alone, with no mention of

Mrs. Martin.  (*Id.*, at p. 1).  Yet, it is difficult to conclude otherwise than that such pleading is

intended to assert claims for relief on behalf of both of the Martins.  First, the caption lists both

"BRYAN MARTIN AND SHADI MARTIN, individuals," identifying each as a

"Defendant/Counter-Plaintiff."  (*Id.*)  Likewise, the body of the pleading devotes a separate

paragraph to identifying Mrs. Martin and alleging her citizenship for jurisdictional purposes (*id.,*

13

¶ 2), along side the paragraphs similarly describing Mr. Martin, Travelers, First American, and all others acknowledged to be parties.  (*Id.,* ¶¶ 1, 3-10).  And finally, the pleading expressly alleges that "the Martins," plural, "have suffered damages, including economic losses, emotional distress, attorneys' fees, and expenses" as a result of the Adverse Parties' alleged wrongful conduct, and the pleading demands judgment accordingly, on behalf of "the Martins."  (*Id.,* ¶ 42).

That said, whether Mrs. Martin is properly a party at this time is subject to doubt.  Even if the Amended Counterclaim and Third Party Complaint purports or is intended to assert claims on her behalf, such was clearly unauthorized as a matter of procedure.  If Mrs. Martin had been named as a defendant by Travelers, she would generally be eligible to assert counterclaims under FED. R. CIV. P. 13 and/or third-party claims under FED. R. CIV. P. 14(a).  As explained above, however, she is not a defendant to any claim.  Therefore, she cannot unilaterally insert herself into the litigation by merely filing a joint pleading with her husband that includes claims of her own against Travelers or others; if Mrs. Martin desired to become a party, she could only properly do so through a motion to intervene pursuant to FED. R. CIV. P. 24.  *See Hubner v. Schoonmaker*, 1990 WL 149207, at *3-5 (E.D. Pa. Oct. 2, 1990); *Cowan v. Tipton*, 1 F.R.D. 694 (E.D. Tenn. 1941); *Oil Mop LLC v. Summit Env't'l Servs., LLC*, 2011 WL 2601006, at *2 (E.D. La. June 30, 2011) ("[A]n individual or entity that has not been named as a defendant may not assert a counterclaim without first becoming a party to the suit." (citing 3 James Wm. Moore, *Moore's Fed. Prac.* § 13.09[2][a] (3d ed. 2000)); *Premier Foods of Bruton, Inc. v. City of Orlando*, 192 F.R.D. 310, 312 (M.D. Fla. 2000) ("A nonparty cannot on its own motion join as a party under Rule 19 or 20."); *cf. City of Tampa v. Fourth Tug/Barge Corp.*, 163 F.R.D. 622, 624 (M.D. Fla. 1995) (holding that a nonparty cannot file a cross-claim and join additional parties under Rule 13(h); only parties can file cross-claims).

14

However, Mrs. Martin's failure to file a formal motion for leave to intervene before the filing of the Amended Counterclaim and Third Party Complaint is not necessarily fatal to her status as an intervenor. *See American Nat. Bank & Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 582 (7th Cir. 1984); *Montgomery v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir. 1978). Rather, the court has discretion to treat the pleading as including a motion to intervene and to overlook non-prejudicial, technical defects in complying with Fed. R. Civ. P. 24(c)[6]. *See American Nat. Bank & Trust Co. of Chicago*, 750 F.2d at 582; *Montgomery*, 572 F.2d at 255; *Loyd v. Alabama DOC*, 176 F.3d 1336, 1341 (11th Cir. 1999); *Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985); *Farina v. Mission Investment Trust*, 615 F.2d 1068, 1074-75 (5th Cir. 1980)[7]; *see also* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). Again, none of the Adverse Parties have complained that Mrs. Martin is not a proper party or that her joinder is irregular as it relates specifically to principles governing intervention. Moreover, the claims pled on behalf of Mr. Martin and Mrs. Martin clearly arise from the same underlying events. Indeed, her claims would appear to travel entirely with those of her husband, except insofar as it appears that only Mr. Martin, and not Mrs. Martin, might have signed either the Redemption Bond or the Indemnity Agreement. As a result, she might be permissively joined under Fed. R. Civ. P. 20(a)(1), which authorizes plaintiffs to sue together where their claims arise out of the same transaction or occurrence and share a common question of law or fact. It is

---

[6]"A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

[7]The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

therefore recommended that the court treat the Amended Counterclaim and Third-Party

Complaint as including a request by Mrs. Martin to intervene, that she be granted such leave, and

that Mrs. Martin be formally added as a party on the docket sheet, pursuant to Rules 24 and Rule

21.  More particularly, for reasons explained in the following section, Mrs. Martin is due to be

added and designated as a "counterclaim plaintiff."

> **B.      First American's Motion to Strike or Dismiss and the Martins'
>          Motion for Leave to Amend**

First American has moved to strike or dismiss the Martins' "third-party claims" against it,

on the ground that they cannot be maintained as a third-party action under FED. R. CIV. P.  14.

(Doc. 46).  Pursuant to that Rule, "a defending party, may as third-party plaintiff," assert a claim

against "a nonparty who is or may be liable to [the third-party plaintiff] for all or part of the claim

against [the third-party plaintiff]."  FED. R. CIV. P. 14(a)(1).  The purpose of this rule is to permit

"a defending party to join an absentee for the purpose of deflecting to that absentee all or part of

its potential liability to the plaintiff on the underlying claim."  3 James Wm. Moore et al.,

*Moore's Fed. Practice* § 14.03[1] (3d ed. 2009).  However, "Rule 14(a) allows a defendant to

assert a claim against any person not a party to the main action only if that third person's liability

on that claim is in some way dependent upon the outcome of the main claim."  *United States v.*

*Olavarrieta*, 812 F.2d 640, 643 (11th Cir. 1987).  It "does not allow the defendant to assert a

separate and independent claim even though the claim arises out of the same general set of facts

as the main claim."  *Id.* (citing *Southeast Mortg. Co. v. Mullins*, 514 F.2d 747, 749-50 (5th Cir.

1975); *United States v. Joe Grasso & Son, Inc.*, 380 F.2d 749, 751-52 (5th Cir. 1967)).

First American argues that the Martins' would-be third-party claims against First

American are not authorized by Rule 14 because the liability on those claims is not derivative of

that which either of the Martins might have on Travelers' original claim.  The court need not

resolve whether the Martins' claims against First American are authorized by Rule 14, however,

because the Martins have effectively conceded that point, though they maintain that those claims

are still due to remain in the action.  Specifically, the Martins say that their claims against First

American are "[in]artfully styled" in their pleading as "third party claims" under FED. R. CIV. P.

14, but that they are, in actuality, counterclaims authorized by FED. R. CIV. P. 13.  (Doc. 51 at 1

n. 1; *see also id.* at 1-2).  If the Martins are correct, those claims would not be subject to

dismissal simply because they have been mislabeled as "third-party claims."  *See CNH Capital*

*Am., LLC v. Southeastern Aggregate, Inc.*, 2009 WL 1759572, at *4 (S.D. Ga. June 18, 2009);

*Sky-Med, Inc. v. Skydiving Sch., Inc.*, 2014 WL 198801, at *2 n. 2 (D. Haw. Jan. 16, 2014);

*Legion Ins. Co. v. Family Serv., Inc.*, 561 F. Supp. 2d 232, 236 (D.R.I. 2008).  Therefore, the

question becomes whether the Martins' claims against First American are, in substance,

counterclaims properly joined under Rule 13.

A counterclaim is a claim that a pleader has against an opposing party.  FED. R. CIV. P.

13(a), (b).  Thus, claims that Mr. Martin, the original defendant, asserts against Travelers, the

original plaintiff, are obviously counterclaims under Rule 13.  However, counterclaims need not

be directed only against original plaintiffs.  Rather, Rule 13(h) authorizes the joinder of

additional counterclaim defendants as provided by Rules 19 and 20, FED. R. CIV. P.  *See also*

*Gentry v. Smith*, 487 F.2d 571, 579 (5th Cir. 1973).  The Martins contend that First American is

properly joined as such pursuant to Rule 20, which governs the permissive joinder of parties.

Under Rule 20, "[p]ersons ... may be joined in one action as defendants if:

> (A) any right to relief is asserted against them jointly, severally, or in the
> alternative with respect to or arising out of the same transaction, occurrence, or
> series of transactions or occurrences; and

17

(B) any question of law or fact common to all defendants will arise in the action.

FED. R. CIV. P. 20(a)(2).  "Rule 13(h), however, has been interpreted as only authorizing courts to join additional persons in order to adjudicate a counterclaim that is already before the court or one that is being asserted against an existing party at the same time the addition of the non-party is sought."  *CNH Capital Amer., LLC*, 2009 WL 1759572, at *4 (citing 6 Charles A. Wright, et al., *Fed. Prac. & Proc.* § 1435, at 270-71 (2d ed. 1990)).  "This means that a counterclaim ... may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party."  *Id.*

First American argues that it is not properly joined under Rule 13(h) because the Martins' claims against it do not, First American says, share any common question of law or fact with the Martins' claims against the original plaintiff, Travelers, as required by Rule 20(a)(2)(B).  (*See* Doc. 53, ¶¶ 6-20).  First American concedes that the Martins have alleged that Plowman engaged in wrongdoing while acting as the agent of both Travelers and First American in connection with the closing transaction.  (*Id.*, ¶ 13).  However, First American posits that the "Martins' claims against Travelers can only relate to [the Martins'] allegations that they were not advised that 'the seller (third party Defendant (sic) E & R) would have been the proper party to the indemnity agreement ....' "  (*Id.*, ¶ 12 (quoting Doc. 33 ¶ 40)).  By contrast, First American says, the Martins' claims "against First American arise from the allegation that Nikki Plowman, an employee of First Capital ..., First American's limited title agent, failed to inform [the Martins] 'that the personal representative of the former owner of the Property had contacted Plowman and E & R concerning redemption of the Property."  (*Id.* (quoting Doc. 33 ¶ 44)).  From there, First American postulates that "Plowman's only authority [to act on behalf of] First American was to solicit applications for title insurance, collect premiums, and issue title commitments and polices

18

on behalf of First American." (*Id.,* ¶ 14). First American contends, therefore, any other actions that Plowman might have taken in closing the real estate transaction fell outside the scope of First Capital's limited agency with First American," such that "First American cannot incur any liability based on any allegation that Plowman or First Capital allegedly withheld information regarding, for example, whether 'the former owner of the Property had contacted Plowman and E & R concerning redemption of the Property.' " (*Id.,* ¶ 18 (quoting Doc. 33, ¶ 44)).

First American's argument is due to be rejected. First, it rests largely upon an assertion that the Martins' claims are due to fail on the merits. However, the "standard for a motion to add a counterclaim defendant [under Rules 13(h) and 20(a)(2)] does not speak to the merits of the cause of action alleged." *Hoffman v. Wisner Classic Mfg. Co., Inc.*, 927 F. Supp. 67, 74 (E.D. N.Y. 1996). Second, First American's argument relies upon an overly-strict and technical reading of Rule 20(a). "The provisions for permissive joinder under Rule 20 are very broad and the court is given discretion to decide the scope of the civil action and to make such orders as will prevent delay or prejudice." *Arrington v. City of Fairfield, Ala.*, 414 F.2d 687, 693 (5th Cir. 1969). The central purpose of Rule 20 is "to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." *Swan v. Ray*, 293 F.3d 1252, 1253 (11th Cir. 2002) (per curiam) (quotation omitted). "Rule 20 does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties." *Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1324 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). In other words, "the transaction and common-question requirements prescribed by Rule 20(a) are not rigid tests." 7 Charles A. Wright, et al., *Federal Practice & Proc.*, § 1653, at 415 (3d ed. 2001). Rather, "they are flexible concepts used by the courts to implement the purpose of Rule 20 and

19

therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy." *Id.; see also United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the [Federal Rules of Civil Procedure], the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.").

The Martins' claims against Travelers and First American share at least one common question or law or fact and are otherwise properly joined under Rule 20(a)(2). Travelers does not dispute that those claims arise out of the same transaction or occurrence. Indeed, the Martins' claims against all Adverse Parties arise out of a single transaction in which the Martins' agreed to purchase the Property from E & R at a closing on September 30, 2013. That closing, in turn, encompassed several sub-transactions, whereby the Martins took out a loan from the Bank to finance their purchase of the Property and in which Mr. Martin, either alone or jointly with his wife, also paid for both the Redemption Bond issued by Travelers and a title insurance policy issued by First American. The crux of the Martins's countersuit is that they were defrauded by the Adverse Parties, acting alone or in concert, into purchasing all of those items. In particular, the Martins include claims based on allegations that the closing agent, Plowman, was told several days before the closing that a representative of the prior owner of the Property had expressed, at least informally, an intention to redeem. The Martins contend that Plowman, acting as the agent of, among others, Travelers and First American, breached a duty to disclose that fact, with such concealment leading the Martins to proceed with the closing, including as it relates to their purchase of both the Redemption Bond and the title policy. (*See* Doc. 33 ¶¶ 38, 39, 41, 42). The Martins further assert that the Adverse Parties together engaged in a fraudulent conspiracy in order to profit from the transaction, including Travelers' receipt of a premium for the

20

Redemption Bond and First American's receipt of a premium for the title policy.  (*See id.*, ¶¶ 33, 35, 50-52).  At a minimum, the Martins' counterclaims against Travelers and First American, whatever their ultimate merits, share common issues of law and fact as it relates to what Plowman knew about Jones's expressed intention to redeem, when she knew it, whether she had a legal duty to disclose it to the Martins, for whom Plowman might have been acting as an agent in the transaction, and whether the Adverse Parties participated in a scheme to defraud the Martins.  *See HSBC Bank USA, Nat. Ass'n v. Resh*, 40 F. Supp. 3d 728, 736 (S.D.W. Va. 2014) (holding that mortgagors' counterclaims against real estate agent, real estate firm, appraiser's alleged successor, appraiser's alleged former employee, title insurer, and insurer's former employee, alleging that mortgagors were victims of fraudulent scheme in which they were induced to purchase commercial properties based on fraudulent information regarding properties' ownership and value arose from same transaction and shared common question of law or fact under Rule 20(a)(2)).  Therefore, the Martins' counterclaims claims against First American are properly joined pursuant to Rules 13(h) and 20(a)(2), and the court may exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367(a).[8]

---

[8]Notwithstanding the necessity to plead a basis of jurisdiction, *see* FED. R. CIV. P. 8(a)(1), the Martins' pleadings do not cite any statute under which this court might entertain their affirmative claims for relief, including as it relates to the various new parties they have brought into the litigation.  (*See* Docs. 7, 33).  And while no party raises the issue, the court has an independent obligation to satisfy itself that subject-matter jurisdiction exists. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  Jurisdiction over Travelers' original claim against Mr. Martin is founded on 28 U.S.C. § 1332, which generally requires complete diversity, *i.e.*, no plaintiff may share citizenship with any defendant.  *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998).  However, the Martins' Amended Counterclaim and Third-Party Complaint does not allege complete diversity between the Martins, who are Alabama citizens (Doc. 33 ¶¶ 1, 2), and the various parties targeted by their counterclaims.  Indeed, it appears that, at a minimum, two of those counterclaim defendants, First Capital and Pritchett-Moore, are Alabama corporations with their respective principal places of business in Alabama (*Id.* ¶¶ 5, 9; Doc. 35, ¶ 9; Doc. 36, ¶ 5), making them Alabama citizens as well.  *See* 28 U.S.C. § 1332(c)(1).  Even so,

First American argues, however, that the court should nonetheless disallow the joinder of the counterclaims against it on the alternative basis that, in attempting to file the pleading by which those claims are raised, the Amended Counterclaim and Third-Party Complaint, the Martins failed to comply with Rules 15(a) and 16(b), FED. R. CIV. P.  Under the former, a party may amend its pleading once as a matter of course, unilaterally, within 21 days after serving it, or, within 21 days after a responsive pleading or a motion under Rule 12(b), (e), or (f), has been filed, whichever is earlier.  FED. R. CIV. P. 15(a)(1).  All other amendments require leave of court or the opposing party's written consent, though the Rule instructs that the "court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a)(2).  Rule 16(b), on the other hand, authorizes the court to enter a scheduling order imposing a variety of deadlines, including as it relates to when the parties may amend to add new claims and parties.  FED. R. CIV. P. 16(b)(3)(A).  A Rule 16(b) scheduling order "may be modified only for good cause and with the

---

once a district court has original jurisdiction over one or more claims, it generally may exercise "supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Further, "such supplemental jurisdiction .... include[s] claims that include the joinder or intervention of additional parties." *Id.*; *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).  "Simply explained, § 1367(a) grants the federal judiciary congressional approval to extend supplemental jurisdiction to the limits of the Constitution."  *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1352 n. 4 (11th Cir. 1997).  Travelers' original claim and the Martins' counterclaims clearly arise out of the same transaction or occurrence and are part of the same case or controversy.  Section 1367(b) operates as an express limitation on supplemental jurisdiction over certain claims where the district court is sitting in diversity.  28 U.S.C. § 1367(b).  However, such limitation applies only to claims asserted by "plaintiffs," a term interpreted not to encompass an original defendant or a third party that raises claims for relief as a "counterclaim plaintiff."  *See State Nat. Ins. Co. Inc. v. Yates*, 391 F.3d 577, 580-81 (5th Cir. 2004); *Viacom Int'l, Inc. v. Kearney, 212* F.3d 721, 726–27 (2d Cir. 2000); *Development Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 160 (3d Cir. 1995).  Accordingly, § 1367(b) does not apply to the Martins' counterclaims, so the court may exercise supplemental jurisdiction over them pursuant to § 1367(a), without regard to the citizenship of the parties.

judge's consent." FED. R. CIV. P. 16(b)(4).  When a party seeks to amend after the expiration of a deadline established by the court's scheduling order, the party must first satisfy Rule 16(b)'s "good cause" standard for modification before the court might grant leave under the more liberal standard of Rule 15(a)(2).  *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998).

The court's Rule 16(b) order afforded Mr. Martin until August 14, 2015, to add new parties or claims, so his Amended Counterclaim and Third Party Complaint, filed on June 1, 2015, came within that deadline.  First American emphasizes, however, that such amendment could not be filed as a matter of course under Rule 15(a)(1) but instead required leave of court or written consent of adverse parties under Rule 15(a)(2), neither of which the Martins sought before filing.  First American recognizes that, contemporaneously with the filing of their response to First American's motion to strike or dismiss filed August 13, 2015, the Martins formally moved under Rule 15(a)(2) for the court to allow their previously-filed Amended Counterclaim and Third-Party Complaint.  First American highlights, however, that the Martins' motion for leave was not filed until August 28, 2015, only after the expiration of the Rule 16(b) scheduling order's deadline for Mr. Martin to add new claims or parties.  As a result, First American contends that the Martins' Amended Counterclaim and Third-Party Complaint should be considered "without legal effect" and that their motion for leave to file it should be denied because they have failed to show "good cause" to modify the scheduling order under Rule 16(b).

The Martins correctly do not dispute that their Amended Counterclaim and Third-Party Complaint could not be filed as a matter of course under the terms of Rule 15(a)(1).  The Martins suggest, however, that they need not have actually sought leave to amend under Rule 15(a)(2) because they filed their amended pleading prior to the deadline set by the court's Rule 16(b) order for Mr. Martin to add new claims or parties.  (*See* Doc. 51 at 2 (stating that their

amendment "was proper under the Court's Scheduling Order" and that they have filed their motion for leave to amend merely "in an abundance of caution")).  In this, the Martins are wrong. Neither the court's scheduling order nor Rule 16(b) itself purports to waive or suspend the presumptive requirements of Rule 15(a)(2).  *See Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 678-79 (5th Cir. 2013); *Klein v. Marvin Lumber & Cedar Co.*, 575 F. App'x 347, 350 (5th Cir. 2014); *Greggs v. Autism Speaks, Inc.*, 987 F. Supp. 2d 51, 54 (D.D.C. 2014).

Nonetheless, as a general principle, "justice requires that a party be allowed to have all of its claims and defenses heard on the merits unless that party's failure to articulate the claim before the amendment harms the adverse party's ability to press its claims and defenses." *Little v. National Broad. Co.*, 210 F. Supp. 2d 330, 372 (S.D.N.Y. 2002) (quoting *American Angus Ass'n v. Sysco Corp.*, 865 F. Supp. 1174, 1175 (W.D.N.C. 1993)).  The Martins proposed amendment was filed within the deadline set by the court's scheduling order, and the Martins have moved the court to allow such amendment.  First American has identified no prejudice it would suffer by consideration of the amendment.  Rather, First American relies upon a pure legal formalism: that the Martins' motion requesting leave for its previously-filed amendment came shortly after the expiration of the scheduling order deadline for adding new parties and claims. As First American highlights, the Eleventh Circuit has stated, "In general, if an amendment that cannot be made as of right is served without obtaining the court's leave or the opposing party's consent, it is without legal effect and any new matter it contains will not be considered unless the amendment is resubmitted for the court's approval." *Hoover v. Blue Cross & Blue Shield of Ala.*, 855 F.2d 1538, 1544 (11th Cir. 1988) (quoting 6 Charles A. Wright, et al., *Fed. Practice & Proc.* § 1485 at 421 (1971) (emphasis added in *Hoover* omitted)).  However, in its next breath, our court of appeals recognized an accompanying limiting principle, to the effect that

24

> an untimely amended pleading served without judicial permission may be considered as properly introduced when leave to amend would have been granted had it been sought and when it does not appear that any of the parties will be prejudiced by allowing the change.  Permitting an amendment without formal application to the court under these circumstances is in keeping with the overall liberal amendment policy of rule 15(a) and the general desirability of minimizing needless formalities.

*Id.*  (quoting 6 Charles A. Wright, et al., *Fed. Practice & Proc.* § 1485 at 421 (1971) (emphasis added in *Hoover* omitted)).  Thus, it is within this court's discretion to treat the Martins' proposed amended pleading as if it were accompanied by a motion for leave.  Moreover, when First American pointed out that the Martins had not complied with Rule 15(a)(2) as it relates to their proposed amendment, the Martins acted promptly to remedy that defect by filing their motion for leave.  Even though that curative action came shortly after the scheduling order deadline, it appears that the Martins were acting in good faith, and, again, First American has cited no prejudice.  In such circumstances, the Martins' motion for leave to file their Amended Counterclaim and Third-Party Complaint is due to be granted while First American's corresponding motion to strike or dismiss that pleading is due to be denied.  *See Brooks v. Clinton*, 841 F. Supp. 2d 287, 297 (D.D.C. 2012) (holding that the defendant satisfied the standards of Rule 15(a) and 16(b) where its amended answer was filed within the scheduling order deadline and the defendant promptly filed a motion for leave, after the scheduling order deadline, in response to the plaintiff's motion to strike the amended answer).

## C.   Travelers' Motion for Partial Summary Judgment and the Martins' Rule 56(d) Motion to Defer Ruling

### 1.   Summary Judgment Standards

Travelers has moved for partial summary judgment, by which it seeks to prevail on its claim for indemnity against Mr. Martin.  Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL

PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(a).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  When the moving party has the burden of proof at trial with respect to a claim or defense, it must support its motion with evidence that would entitle it to a directed verdict if not controverted at trial.  *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).  "In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party."  *Id.*  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show, based on evidence in the record, that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.  Where the plaintiff moves for summary judgment and satisfies its initial burden to establish the elements of its own claim, to defeat the motion based on an affirmative defense, the defendant must present evidence sufficient to allow the trier of fact to find in the defendant's favor on the defense.  *See Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 & n. 13 (11th Cir. 1990); *Wells Fargo Bank, N.A. v. Trotman*, 940 F. Supp. 2d 1359, 1368 n. 8 (M.D. Ala. 2013); *see also Johnson v. Board of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) ("[The] burden is on defendant to adduce evidence

supporting [an] affirmative defense, not upon [the] movant to negate its existence" (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090-91 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991)).   In its review of the evidence at summary judgment, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### 2.     Mr. Martin's Potential Liability Absent an Express Indemnity Agreement

Travelers argues that it is entitled to summary judgment against Mr. Martin because the evidence establishes (1) that Mr. Martin and Travelers signed the Redemption Bond as principal and surety, respectively, and (2) that Travelers paid First American's claim on that bond in the amount of $77,440.14 after Jones redeemed the Property.  Travelers maintains that, as a consequence of that principal-surety relation, Mr. Martin is liable under Alabama law[9] to reimburse Travelers for its payment, as well as for an additional $14,534.00, representing attorney's fees, costs, and expenses that Travelers incurred investigating and resolving the claim under the Redemption Bond and enforcing Mr. Martin's obligation as principal.  Thus, Travelers seeks entry of summary judgment on its claim against Mr. Martin in the amount of $91,578.14.

Mr. Martin admits that he signed the Redemption Bond and that such document identifies him as the "principal" and Travelers as the "surety."  He further acknowledges that the "plain

---

[9]The parties agree that Alabama substantive law governs Travelers' claim for indemnity in this diversity action.  *See generally* 28 U.S.C. § 1652; *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *McMahan v. Toto*, 256 F.3d 1120, 1131 (11th Cir. 2001).

language of the [Redemption Bond] states that [Mr.] Martin (as principal) shall indemnify and

hold harmless First American," in the event of a redemption.  (Doc. 27 at 11).  The Martins also

do not dispute that Travelers paid First American's claim under the Redemption Bond.  They

also do not challenge any particular aspect of the associated attorney fees or other additional

charges claimed by Travelers.  The Martins maintain, however, that Travelers' motion for

summary judgment is due to be denied because the language of the Redemption Bond does not

itself expressly provide that Mr. Martin would be bound to indemnify Travelers if the latter were

to pay a claim thereupon.  The Martins take the position, rather, that Mr. Martin might only be

liable if it is ultimately determined that he also signed the *bond application* containing the

*Indemnity Agreement*, which does explicitly set out an obligation to reimburse Travelers.  And

Travelers cannot now prevail on that basis, the Martins say, because they have presented

evidence, due to be credited at summary judgment, that the Indemnity Agreement was not

presented to them at the closing and that Mr. Martin's purported signature on the instrument is a

forgery.

"Under Alabama law, a surety's right of reimbursement from its principal for losses

incurred on bonded obligations is established in a number of ways – by common law, contract,

and statute."  *Hanover Ins. Co. v. Hudak & Dawson Const.*, 946 F. Supp. 2d 1208, 1218 (N.D.

Ala. 2013).  As to the former, the Alabama Supreme Court has recognized generally that "when a

surety satisfies the principal's obligation, it is entitled to reimbursement or restitution from the

principal."  *SouthTrust Bank of Ala., N.A. v. Webb-Stiles Co.*, 931 So. 2d 706, 712 (Ala. 2005).

Likewise, that right has been codified by legislation providing that "[p]ayment by a surety ... of a

debt past due entitles him to proceed immediately against his principal for the sum paid, with

interest thereon, and all legal costs to which he may have been subjected by the default of the

principal."  Ala. Code § 8-3-5 (1975); *see also Hanover Ins. Co.*, 946 F. Supp. 2d at 1219.  And,

finally, a principal and surety may, of course, enter into an express contract spelling out the terms

under which the surety is entitled to indemnity for its discharge of a debt owed by the principal.

*See, e.g., Hanover Ins. Co.*, *supra*.  "Thus, based contract principles and applicable law, if a

surety sufficiently demonstrates that it has made payments on bonds issued on behalf of its

principal, the surety may recover those payments, interest, expenses, and attorney's fees."  *Id.*,

946 F. Supp. 2d at 1219; *see also Frontier Ins. Co.*, 124 F. Supp. 2d at 1214.

The Martins are correct that the evidence would allow a jury to find that Mr. Martin's

signature on the Indemnity Agreement is not genuine.  As a result, it is assumed that there is no

express contract by which Mr. Martin promised to reimburse Travelers.  Even so, the Martins are

simply incorrect that Mr. Martin cannot be liable absent the existence of such an express

indemnity agreement.  As one commentator has explained:

> From the date of the very early reported cases the courts of equity have
> recognized the obligation of one principally liable to reimburse his surety for
> moneys expended by the surety to discharge the debt.  The right of recovery is
> allowed upon the principle that, when one requests another to become liable for
> his obligation he implied promises to make reimbursement to his surety.  It was
> not necessary for the surety to prove an express agreement on the part of the
> principal obligor to reimburse.

William O. Morris, *Accommodation Parties to Negotiable Instruments*, 76 Banking L.J. 277, 282

(1959) (footnotes omitted); *see also Restatement (Third) of Suretyship & Guaranty* § 22 & cmts.

a, c (1996).  This principle has long been observed by the Alabama courts.  *See Alabama Kraft*

*Co., a Div. of Ga. Kraft Co. v. Southeast Ala. Gas Dist.*, 569 So. 2d 697, 700 (Ala. 1990)

(explaining that a surety's right of indemnity against his principal for a debt discharged by the

surety "is usually founded upon an implied contract or legal duty."); *Doster v. Continental Cas.*

*Co.*, 105 So. 2d 83, 86 (Ala. 1958) ("Upon the payment by surety of the debt, for which he is

bound, it being then due, a right of action for reimbursement arises in his favor against the principal, and in the absence of an express agreement the law implies a promise of indemnity on the part of the principal.") (quoting *Searcy v. Shows*, 85 So. 444, 446 (Ala. 1920)); *Martin v. Ellerbe's Adm'r*, 70 Ala. 326, 335 (1881) ("The principal, from the moment the bond was executed, was under a legal liability to indemnify the surety--to save him harmless from all loss by reason of any breach of the condition. ... The contract, the promise of indemnity, is implied by the law, when the relation of principal and surety is formed."); *see also Fidelity & Deposit Co. of Maryland v. Arenz*, 290 U.S. 66, 69 (1933) ("Respondent was bound by agreement, implied by law if not expressly made, that he would make good to petitioner whatever the latter as such surety might be required to pay."); *Howard Johnson, Inc., of Fla. v. Tucker*, 157 F.2d 959, 962 (5th Cir. 1946) ("The general proposition seems well settled that the implied obligation to indemnify the surety arises as an implied contract when the suretyship relation is created, but matures only when he has been injured by being compelled to make payment of the debt.").  As a result, Mr. Martin cannot escape summary judgment on the theory that Travelers cannot prevail unless he signed the Indemnity Agreement.  Instead, Travelers has carried its burden as the movant for summary judgment to establish Mr. Martin's liability under § 8-3-5 and attendant common-law principles[10] based upon his admission that he and Travelers signed the Redemption Bond as principal and surety, respectively, along with the undisputed evidence that Travelers discharged Mr. Martin's primary obligation under that instrument and thereafter incurred

---

[10]Where there is an express indemnity agreement between the principal and the surety, the terms of that contract, and not general equitable considerations, govern the scope of the surety's right to reimbursement.  *See Hanover Ins. Co.*, 946 F. Supp. 2d at 1219.  However, because Mr. Martin has denied signing the Indemnity Agreement, Travelers has indicated that it is willing at this point to proceed as if that express agreement does not exist.

attorney's fees and other related expenses.

### 3. The Martins' Rule 56(d) Motion

The Martins contend, however, that the court should defer consideration of the motion on procedural grounds, pursuant to FED. R. CIV. P. 56(d). (*See* Doc. 57 at 13-19; Doc. 57-2). In support, the Martins claim that, before the court resolves Travelers' motion, they must be afforded an opportunity to depose witnesses and conduct other discovery relating to Mr. Martin's defenses based on allegations of fraud and mistake. (*Id.*) Travelers replies that there is no need for such discovery because none of it would, Travelers says, alter Mr. Martin's liability under § 8-3-5, even if he might be able to recover on one or more of his claims for relief against other Adverse Parties. (Doc. 58 at 3). Travelers also contends that the Martins have already had a reasonable opportunity to take depositions and obtain discovery from Travelers, Plowman, and other Adverse Parties but that the Martins have simply failed to avail themselves of such opportunity. (*Id.*)

"Summary judgment is premature when a party is not provided a reasonable opportunity to discover information essential to his opposition." *Smith v. Florida Dep't of Corr.*, 713 F.3d 1059, 1064 (11th Cir. 2013); *see also Celotex Corp.*, 477 U.S. at 326 & n. 6; *Snook v. Trust Co. of Georgia Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988). A non-movant may combat an allegedly premature motion for summary judgment by filing an application under Rule 56(d), which provides:

> **(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)     defer considering the motion or deny it;
>
> (2)     allow time to obtain affidavits or declarations or to take discovery;

or

(3)     issue any other appropriate order.

Rule 56(d), FED. R. CIV. P.   District courts in the Eleventh Circuit should grant requests under

Rule 56(d) "when the party opposing the [summary judgment] motion has been unable to obtain

responses to his discovery requests" and the discovery sought would be essential to opposing

summary judgment and "relevant to the issues presented by the motion for summary judgment."

*Snook*, 859 F.2d at 870 (citation omitted).   However, because the burden on a party resisting

summary judgment is not a heavy one, a Rule 56(d) motion must demonstrate, with particularity,

what facts the applicant hopes to obtain by discovery and how these facts will raise a genuine

issue of material fact.  *See Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012);

*Hall v. United Ins. Co. of Amer.*, 367 F.3d 1255, 1259 n. 2 (11th Cir. 2004); *Harbert Int'l, Inc. v.

James*, 157 F.3d 1271, 1280 (11th Cir. 1998).

The Martins first say that, before summary judgment may be granted, they are entitled

under Rule 56(d) to conduct discovery to establish a defense that the Redemption Bond is subject

to rescission because Mr. Martin mistakenly believed he was simply buying insurance that would

protect the Martins if the Property were redeemed.  (*See* Doc. 57 at 14; Doc. 57-1, ¶ 9).  The

Martins admit that Mr. Martin's mistake in that regard was unilateral.  Nonetheless, they argue

that Mr. Martin might avoid the agreement under Alabama law by showing that Travelers knew

of Mr. Martin's mistake and caused it.  The Martins proclaim that they expect to obtain such

evidence in discovery.

With regard to the circumstances under which a contract may be voidable based on a

party's unilateral mistake, Alabama courts follow rules derived from §§ 153 and 154 of the

Second Restatement of Contracts.  *See DeVenney v. Hill*, 918 So. 2d 106, 115 (Ala. 2005);

32

*Hackney v. First Ala. Bank*, 555 So. 2d 97, 101 (Ala. 1989).   Under the former section,

> [w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
>> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>>
>> (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (2d) Contracts § 153 (1981).  In turn, § 154 states:

> A party bears the risk of a mistake when
>
> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

*Id.*, § 154.

Under the above principles, Mr. Martin is not entitled to avoid his obligations arising from the Redemption Bond based on his misunderstanding that such agreement was insurance protecting him in the event of a redemption.  Mr. Martin admits he signed the Redemption Bond at the closing.  On its face, nothing in that single-page document suggests that Travelers was promising to indemnify or otherwise insure Mr. Martin against the risk of redemption or anything else.  Rather, as the Martins themselves acknowledge in their brief, the "plain language of the Right of Redemption Bond states that [Mr.] Martin (as principal) shall indemnify and hold harmless First American," the title insurer, if First American was required to pay a claim should there be a redemption.  (Doc. 27 at 11).  The Martins further admit that the "document goes on to

33

state that the principal (Martin) and (along with Travelers) [sic] are bound to First American."

(*Id.*)  In other words, the Redemption Bond unambiguously provides that, to allow the Martins to

obtain title insurance from First American to buy the Property, Mr. Martin was promising to pay

First American if it was required to pay a claim on a redemption and that Travelers was

undertaking to act as surety on Mr. Martin's obligation.  "[O]rdinarily[,] when a competent adult,

having the ability to read and understand an instrument, signs a contract, he will be held to be on

notice of all the provisions contained in that contract and will be bound thereby."  *Power Equip.*

*Co. v. First Ala. Bank*, 585 So. 2d 1291, 1296 (Ala. 1991); *see also Foremost Ins. Co. v.*

*Parham*, 693 So. 2d 409, 439 n. 10 (Ala. 1997) (noting that, in cases of alleged unilateral

mistake, "[o]ne who signs or accepts a written instrument without reading it with care is likely to

be surprised and grieved at its contents later on." (quoting 3 Arthur Linton Corbin, *Corbin on*

*Contracts* § 607, at 656 (1960)).  Mr. Martin has not alleged that he has diminished capacity or is

unable to read or understand English, that anyone misrepresented the nature of the Redemption

Bond to him, nor that he was prevented from reading it or from seeking legal advice before

signing.  Nor does he otherwise attempt to explain specifically why he believed the language of

the Redemption Bond provided insurance coverage for him.  To the extent that Mr. Martin did

not carefully read or did not fully understand the legal effect of the Redemption Bond but

proceeded to sign it anyway, he treated his limited knowledge of the meaning of the document as

sufficient, thereby making it reasonable to allocate to him the risk that he was mistaken.  *See*

*DeVenney*, 918 So. 2d at 115 (allocating to land purchasers risk of mistake related to purchase

price where they "failed to review the closing documents" and that "even if [the purchasers] did

not have actual knowledge of the sales agreement, they were comfortable with having limited

knowledge"); *Hackney*, 555 So. 2d at 101 (allocating risk to guarantor on promissory note where

34

he "was aware at the time of contracting that he had only limited knowledge concerning the subject of the contract, but he treated this knowledge as sufficient"); *see also* Restatement (2d) of Contracts § 153, Reporter's Note to cmt. a ("Courts frequently show lack of sympathy with claims that one party 'did not understand' a term [of a written contract]").  Accordingly, the Martins are not entitled to have the court defer consideration of Travelers' motion for summary judgment under Rule 56(d) as it relates to the Martins' claim of unilateral mistake.

The Martins' Rule 56(d) application also seeks time to conduct discovery to establish a defense based on allegations that Travelers is guilty of fraud that induced Mr. Martin to sign the Redemption Bond.  On that score, a party who has been the victim of a misrepresentation of a material fact or the suppression of a material fact when there is a duty to speak upon which it reasonably relied during contractual negotiations can claim fraud in the inducement.  *See, e.g., Lacey v. Edmunds Motor Co.*, 113 So. 2d 507, 510 (1959) ("It is a well-established principle in Alabama that a buyer alleging that he was induced by fraud to enter into a contract may rescind by restoring benefits and recover payments, or affirm, retain benefits, and sue in deceit for damages ...."); *see also* Restatement (2d) Contracts §§ 161, 164 (1981).  Specifically, the Martins claim that Travelers fraudulently failed to disclose both that Mr. Martin was not the "proper party" to sign the Redemption Bond and that Travelers, "through its agents, Plowman and Pritchett-Moore," knew prior to the closing that Jones or his attorney had advised that the former intended to redeem the Property.  (Doc. 57 at 17).  Finally, the Martins also claim that Travelers engaged in fraud in that it allegedly "hid the [I]ndemnity Agreement from [Mr.] Martin" (*id.*), and that Mr. Martin's purported signature thereupon was forged, potentially by an agent of Travelers.  (*Id.* at 18).  The undersigned concludes, however, that the Martins are not entitled to a continuance of summary judgment to conduct discovery in furtherance of any of these theories.

35

Taking the last theory first, relating to the Indemnity Agreement and Mr. Martin's allegedly forged signature thereon, it must be reiterated that Travelers is not seeking summary judgment based on that document. As discussed previously, no express indemnity contract is necessary to establish Mr. Martin's liability because the law implies a promise to on his part to reimburse Travelers based on Mr. Martin's express promise, as principal, to indemnify First American under the Redemption Bond and Travelers' satisfaction of that monetary obligation as Mr. Martin's disclosed surety. In order to avoid a contract based on fraudulent suppression, the party seeking to do so must show that his opponent had a legal duty to disclose the material fact in question. *See Hackney*, 555 So. 2d at 102. Whether the evidence viewed in the light most favorable to the non-movant reveals circumstances giving rise to a duty to disclose is an issue of law for the court to decide. *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 839 (Ala. 1998). "Alabama's 'bright-line rule is that, 'in commercial transactions involving parties to arm's length negotiations [,] ... [t]he parties have no general obligation to disclose" absent specific and direct questions from the other party.' " *Penmont, LLC v. Blue Ridge Piedmont, LLC*, 607 F. Supp. 2d 1266, 1272 (M.D. Ala. 2009) (quoting *Freightliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 892 (Ala. 2005) (quotations and citations omitted). Given that no express indemnity agreement is needed to impose liability, it logically follows that Travelers had no duty to disclose specifically that the principal may be bound to reimburse the surety if it pays the debt of its principal. Similarly, if the Martins were to prove that Mr. Martin's signature on the Indemnity Agreement is a fake, it would, of course, invalidate that express contract. However, the Martins fail to explain how a forgery on that document, ostensibly unknown to Mr. Martin at the relevant time, could have influenced his decision to sign the Redemption Bond itself, which is the separate instrument upon which Travelers' present claim is

36

founded.  Thus, the Martins are not entitled to relief under Rule 56(d) to perform discovery in an effort to establish that Travelers "hid" the Indemnity Agreement or to identify the individual who allegedly forged Mr. Martin's signature on it.

Next, the Martins argue that they should be permitted to conduct discovery to support their contention that Travelers fraudulently failed to disclose that Mr. Martin allegedly was not the "proper party" to sign the Redemption Bond and that it "should have been" signed instead by E & R, the seller of the Property.  Such relates to the Martins' claim of fraudulent inducement[11] based upon the their conception of how redemption bonds supposedly operate and what they are supposedly to protect in these kinds of real estate transactions more broadly.  The Martins explain their theory thus:

> [T]he basic fundamental reason for the statutory right of redemption from the sale under the power of sale contained in a real estate mortgage is to provide for a scheme to put the foreclosed mortgagor (redeeming party) and the purchaser at foreclosure (purchaser) to their status quo as of the day of foreclosure.  This principle continues when there has been a subsequent sale of the property during the period of redemption; that is, to maintain the status quo of the purchaser as well as the second purchaser as of the date of the closing of the second purchase.  To maintain the status quo of the purchaser and the second purchaser, insurers have offered a product which is known as a Redemption Bond.  The Redemption Bond in this case is a surety or indemnity bond with Travelers as Surety and Martin as Principal, who agreed to indemnify First American from loss occasioned by redemption by a redeeming party. ... [However,] Travelers, conspiring with the other Counter-Defendants, required Martin to act as principal on the "Right of Redemption Bond" and the forged indemnity agreement instead of the purchaser (E & R).  As such, Counter-Defendants were put in a position to profit from a possible redemption, and Martin was put in the position of losing money. (See Ex. B). The status quo was upset.

---

[11]It should be clarified that the Martins do not here claim fraud in the factum, "that is, where a signatory is deceived into signing [an] instrument[ ] in ignorance of [its] true character." *Fortis Benefits Ins. Co. v. Pinkley*, 926 So. 2d 981, 988 (Ala. 2005) (internal quotation marks and citations omitted).  The Martins do not suggest, for example, that Mr. Martin only signed the Redemption Bond because it was hidden from him or because he thought he was signing a different document.

(Doc. 57 at 5-6; *see also id.* at 16-17).

However, the Martins' above line of argument, for which they cite no authority or evidence, is fatally flawed.  For starters, the "relationship between a surety and a principal is not generally one of a fiduciary nature, in that the surety generally does not have a duty to disclose information to its principal."  72 C.J.S. Principal and Surety § 2 (footnotes omitted).  Moreover, the Martins have not pled facts in connection with the signing of the Redemption Bond tending to support that Mr. Martin and Travelers were involved in anything other than an arm's length transaction in which Mr. Martin was capable of protecting his own interests.  While any communications and other circumstances arising from the dealings between Martins and Travelers that might give rise to an agency or confidential relationship would be presumably within the Martins' knowledge, nothing to that effect is disclosed by Mr. Martin's summary judgment affidavit.  Therefore, it may be presumed here that Travelers generally had no duty to volunteer information to the Martins.  *See Owen*, 729 So. 2d at 842-43; *Hackney*, 555 So. 2d at 102; *Allstate Ins. Co. v. Shirah*, 466 So. 2d 940, 944 (Ala. 1985); *Benton v. Clegg Land Co.*, 99 So. 3d 872, 881 (Ala. Civ. App. 2012).  That would include as it might relate to alternative arrangements that might have conceivably been made in connection with the purchase of a redemption bond.  *Cf. General Motors Corp. v. Bell*, 714 So. 2d 268, 280 (Ala. 1996) (financing company would generally have no duty to disclose to dealership of other repossession chargeback plans that financing company extended to other dealerships in the area); *Williams v. Norwest Fin. Ala., Inc.*, 723 So. 2d 97, 104 (Ala. Civ. App. 1998) (financing company had no duty to disclose the fact that other financing alternatives existed that were less expensive to borrower than refinancing existing loans).

Further, the Martins' suggestion that "Travelers ... and other [Adverse Parties] *required*

38

[Mr.] Martin to act as principal on the Right of Redemption Bond" (Doc. 57 at 6 (emphasis added)) is a facile mischaracterization of the transaction.  There is simply nothing in the record supporting an inference other than that Mr. Martin voluntarily agreed to sign that instrument for the purpose of securing financing to purchase the Property.  In this vein, it is quite clear from the Martins' allegations and the documentary evidence that the Martins are simply wrong in their supposition as to whom and what a redemption bond is primarily intended to protect, at least within the confines of the transactions in this case.  The Martins propose that a redemption bond is an product offered by insurers "to maintain the status quo of the purchaser and the second purchaser" should a party redeem the property within the statutory period.  It might be assumed purely for the sake of argument that such might be true in some cases or even generally speaking.  Nonetheless, the Martins admit that the necessity of procuring a redemption bond here ultimately originated with the Bank with whom they had arranged to finance their purchase of the Property.  Specifically, the Martins recognize that the Bank communicated that it would only extend the loan if the Martins were to secure title insurance for the Bank's benefit, including as it might relate to a loss stemming from a redemption.  The Bank presumably demanded that protection because a redemption would extinguish the Bank's mortgage, leaving its loan to the Martins unsecured, at least as to the difference between the amount outstanding on the loan and the redemption price paid.  In turn, the Martins concede that the title insurer, First American, declined to issue a title policy for the Bank unless First American was itself given insurance to cover its liability in the event of a redemption.  And, contrary to the Martins' suggestion, *that* is the primary function of the Redemption Bond here: it serves as a kind of insurance policy to cover the title insurer, with a right afforded to the secondary insurer (Travelers) to proceed against the principal who procured the bond (here, Mr. Martin).  Indeed, the Redemption Bond

says as much on its face.  (*See* Doc. 1-2 (reciting that it was being procured because Mr. Martin "desires to mortgage said real estate" and because First American "is unwilling to insure the title of said real estate without being properly indemnified against any loss or for any claims arising from rights of persons entitled to redeem real estate under the statutes of Alabama").  Because the Martins' allegations and the other evidence demonstrate that a redemption bond was required as a practical matter to allow them to get their loan from the Bank, it is unsurprising that Mr. Martin might have been the party looking to procure such a bond and to sign it as the principal.

But on a more fundamental level, it is simply immaterial whether a seller like E & R might, in some cases, frequently, or even routinely, be the party signing a redemption bond as the principal.  The Martins baldly insist in their brief that such is what typically occurs and that it is what "should have" happened here.  But that is not the deal struck by the parties.  As this case makes starkly apparent, signing a redemption bond as principal involves the assumption of obligation and risk.  It requires that party both to indemnify for a loss suffered by the obligee, *i.e.*, a bank, mortgage company, or title insurer, should a redemption occur, and to indemnify the surety, *i.e.*, the surety company or insurer, if it is required to pay the principal's debt to the obligee.  The Martins seem to suggest or assume that Travelers (or perhaps someone else) could have unilaterally allocated that risk to E & R by "requiring" it, rather than Mr. Martin, to sign the Redemption Bond.  Such an assumption, however, is plainly unfounded.  Rather, E & R would itself have to agree to take on that risk.  While it was the Martins who needed a redemption bond to secure their financing from the Bank, it might be assumed that the Martins could have demanded that E & R sign the Redemption Bond as principal to facilitate the sale of the Property.  But even if that were so, that would have been a matter for negotiation between the parties, and E & R would have been under no obligation to agree to such a proposal, even if declining might

40

have scuttled the sale.  In the end, however, what actually happened is that Mr. Martin agreed to sign the Redemption Bond as principal.  He cannot avoid his reimbursement liability arising from that instrument by arguing, based on what has supposedly occurred in other transactions, that E & R or some other party "should" have been "required" to undertake his obligations and risk instead.  The Martins are not entitled to a continuance or discovery under Rule 56(d) as it relates to Travelers alleged suppression of the fact that Mr. Martin was not the "proper party" to sign the Redemption Bond.

Finally, the Martins ask that summary judgment be deferred to allow discovery to establish that Travelers, through its alleged agents, Plowman and Pritchett-Moore, fraudulently failed to disclose that, several days before the closing, Jones or his attorney had contacted Plowman and that Jones intended to exercise his statutory right to redeem the Property and sought information about the redemption price.  However, as noted above, the Martins have not pled, and Mr. Martin's summary judgment affidavit does not disclose, facts plausibly supporting that the dealings between the Martins and Travelers gave rise to an agency or confidential relationship.  So, again, Travelers, which simply acted as the surety underwriting the Redemption Bond, would not generally have a duty to disclose information to Mr. Martin.  Moreover, the Martins admit that they were aware prior to the closing that the Property was subject to a statutory right of redemption.  Indeed, it is affirmatively disclosed on the face of the Redemption Bond.  Despite that, the Martins do not claim that they inquired of anyone, including Travelers or its alleged agents, about the prospects that any party would redeem.  "[W]hen parties are intelligent and deal at arm's length, with no confidential relations, there is no duty to disclose when information is not requested and that mere silence will not then constitute fraud."  *Shirah*, 466 So. 2d at 944.  In these circumstances, even if the Martins were to show that Travelers or its

41

alleged agents were aware prior to the closing that Jones had expressed a desire or intention to redeem, Travelers had no duty to disclose such information to the Martins.[12]  *Cf. Gewin v. TCF Asset Mgmt. Corp.*, 668 So. 2d 523,  (Ala. 1995) (seller of real property had no affirmative duty to disclose to purchasers that seller was involved in litigation with mortgagee which might affect mortgagee's willingness to release vendor from mortgage); *Shirah*, 466 So. 2d at 944 (no fraudulent suppression where plaintiff was not asked and did not disclose prior DUI convictions in applying for automobile insurance); *Uslife Credit Life Ins. Co. v. McAfee*, 630 P.2d 450, 455 (Wash. Ct. App. 1981) (no fraud where husband who procured credit life policy on his wife was not asked, and did not volunteer, that his wife was suffering from terminal illness) (cited with approval in *Shirah*); *Hollins v. Blackerby*, 507 So. 2d 486, 488-89 (Ala. 1987) (where sellers of real estate acknowledged prior flooding, no confidential relationship existed between buyers and sellers of real estate which would have required the sellers to disclose information regarding the

---

[12]It also bears noting that the Martins' overarching theory that all of the Adverse Parties were aware of an impending redemption by Jones and conspired to suppress that fact in order to profit from the closing at the Martins' expense is generally implausible as it relates to Travelers itself.  That is, while some Adverse Parties certainly might have had incentive to proceed with the closing in light of an expectation that Jones would redeem, it is not clear why Travelers had motive to do so.  The Martins suggest that Travelers knew about Jones's intent to redeem but kept mum because Travelers wanted the premium on the Redemption Bond, $1,285.00.  But surety companies like Travelers are not in the business of selling bonds upon which they expect to have to pay a claim.  The math in this case makes it obvious why.  A redemption would expose Travelers to potential liability of up to one-hundred times the premium, *i.e.*, the $128,500 face amount of the Redemption Bond.  Indeed, when Jones redeemed, Travelers had to pay out to First American to the tune of $77,044.14.  To be sure, there may be an express or implied agreement that the principal will reimburse the surety who has paid the debt.  Even so, securing such reimbursement is by no means necessarily easy, cheap, or guaranteed.  As this case shows, it may require the surety to file a lawsuit, ultimately prevail, and then hope that the principal is not judgment-proof.  In the end, therefore, it simply makes little sense that Travelers would knowingly sign on as the surety on the Redemption Bond if Travelers believed there was an imminent redemption in the works, which would trigger on obligation to pay not only on the part of the Martins but also Travelers itself.

depth of the flooding in the basement).  Because the Martins are not entitled to forestall summary judgment to conduct any of the discovery they seek, their Rule 56(d) motion is due to be denied.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** as follows: (1) that the court clarify, *sua sponte*, that Mrs. Martin is a party and direct the Clerk to add her to the docket sheet as a "counterclaim plaintiff"; (2) that First American's motion to strike or dismiss the claims asserted against it in the Martins' Amended Counterclaim and Third-Party Complaint (Doc. 46) be **DENIED**; (3) that the Martins' Rule 15(a) motion seeking authorization for the filing of their Amended Counterclaim and Third-Party Complaint (Doc. 52) be **GRANTED**; (4) that the Martins' motion under Rule 56(d) to defer summary judgment and allow discovery (Doc. 57 at 13-19) be **DENIED**; and (5) that Travelers' motion for partial summary judgment on its claim for indemnity against Mr. Martin (Doc. 54) be **GRANTED**.

<u>**Notice of Right to Object**</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), FED. R. CIV. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

**DONE**, this 6th day of September, 2016.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge